## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DANN GRILLO,

        Plaintiff,

    v.

METROPOLITAN WATER RECLAMATION
DISTRICT OF GREATER CHICAGO, JAMES
MCNAMARA, and JIM DOUGLAS,

        Defendants.

No. 18 CV 5607

Judge Manish S. Shah

### MEMORANDUM OPINION AND ORDER

Dann Grillo, a truck driver for the Metropolitan Water Reclamation District, experienced many physical injuries over his career, most recently to his right shoulder. Grillo sued the District for failure to accommodate, discrimination, retaliation, and harassment under the Americans with Disabilities Act and age discrimination under the Age Discrimination in Employment Act. He also sued his supervisors James McNamara and Jim Douglas for violations of his constitutional rights under 42 U.S.C. § 1983. But Grillo's factual and legal approach—to throw everything against a wall and see if something sticks—fails to establish any material dispute. The District's motion for summary judgment is granted.

## I.    Legal Standard

A party moving for summary judgment must show there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All facts and reasonable inferences are drawn in the nonmoving

party's favor. *Hackett v. City of South Bend*, 956 F.3d 504, 507 (7th Cir. 2020). The movant must show that a reasonable jury could not return a verdict for the nonmovant, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), or that the nonmovant has failed to establish an essential element of his claim and could not carry his burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.  Background

### A.  Local Rules

The purpose of Local Rule 56.1 is to identify a party's key facts and supporting evidence. *See* N.D. Ill. Local R. 56.1; *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). "The rule aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414–15 (7th Cir. 2019). Consequently, district courts can require strict compliance with the rule, *id.*, and do not have to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). Grillo's 56.1 responses, [73], and statement of facts, [80], contain too many Local Rule 56.1 violations. His approach would exceed the number of facts allowed, without the court's approval, by including additional facts in his responses and headers. *See* N.D. Ill. Local R. 56.1. Many of his assertions and denials lack specific references to the record. *See id.* His technique of citing to other facts "for a better understanding" or "further context" also fails to specifically controvert the defendants' asserted fact. *See id.* He relies on conclusory statements and includes

improper legal argument. *Id*. Any fact not properly asserted is ignored, and any fact not properly controverted is deemed admitted.

### B.    Facts

Dann Grillo, born in 1955, started working as a truck driver for the Metropolitan Water Reclamation District of Greater Chicago in 1990. [73] ¶ 2; [80] ¶ 1.[1] The District is a unit of local government, responsible for sewage treatment and storm water management for most of Cook County. [73] ¶ 3. As a truck driver, Grillo's responsibilities included driving different vehicles, hauling materials, operating heavy equipment, and responding to emergency situations, like malfunctioning equipment. [73] ¶ 53.[2]

Over the course of his career, Grillo experienced many injuries that led to disputes with his employer. In 1996, Grillo suffered a left shoulder injury and took disability leave. [73] ¶ 23; [80] ¶ 2. When the District disputed his request to return to work with accommodations, Grillo filed an EEOC charge, followed by a federal lawsuit in 2001. [73] ¶ 7; [80] ¶¶ 2–3. The EEOC concluded that there was reasonable cause to believe the District violated the ADA. [80] ¶ 4. The lawsuit settled, and Grillo returned to work. [80] ¶ 4. A few years later, Grillo filed another EEOC charge based on disability discrimination and retaliation, which led to a second federal lawsuit in

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are from the CM/ECF header placed at the top of documents. Facts are largely taken from responses to the parties' statements of material facts, where the original facts and responses are in one document. [73]; [80].

[2] Grillo's denial that defendants' job description is inaccurate, misleading, and self-serving fails to cite specific references in the record that controvert defendants' assertion. [73] ¶ 53. Defendants' fact 53 is deemed admitted.

2006. [73] ¶ 7; [80] ¶ 5. The District's motion for summary judgment was denied, and the case settled. [80] ¶¶ 5–6; Minute Entry, [84], *Grillo v. Metropolitan Water Reclamation District of Greater Chicago*, No. 06-CV-01511 (N.D. Ill. 2007).[3]

In 2010, Grillo experienced a right knee and hip injury. [73] ¶ 23; [80] ¶ 6. In 2012, he injured his right shoulder. [73] ¶ 23; [80] ¶ 6. In 2014, Grillo reinjured his back, right knee, and right hip and also suffered another, unidentified injury. [73] ¶ 23; [80] ¶ 6; [72-25].[4] Grillo said he was reinjured after attaching a trailer to a large truck and hauling a machine from one plant to another while still on "light duty" restrictions that limited his lifting, pushing, and pulling movements due to a previous injury. [73] ¶ 24. He also said that when his lower back injury flared up, he could not bend, squat, run, or lift, and had a hard time walking. [73] ¶ 25. The District eventually settled Grillo's requests for workers' compensation for all of these injuries (much later, in 2019) but did not concede they were work-related, i.e. "on-the-job" injuries. [72-25]; [73] ¶ 64; [80] ¶ 6.[5]

Grillo also had problems with two of his bosses. When James McNamara started as a Master Mechanic in 2012, he assigned Grillo to drive different trucks. [73] ¶¶ 3, 67. While this was within McNamara's authority, Grillo had expected to be

---

[3] Courts may take judicial notice of public records, like public court documents. *See* Fed. R. Evid. 201; *White v. Keely*, 814 F.3d 883, 885, n.2 (7th Cir. 2016).

[4] A third-party administrator concluded Grillo's reinjuries in 2014 were not work-related. *See* [80] ¶ 12. Plaintiff incorrectly attributes the administrator's conclusion to Grillo's left knee injury in May 2016, [80] ¶ 12, but the underlying testimony is about Grillo's reinjuries in May 2014. [56-16] at 12.

[5] Whether an injury was work-related mattered for purposes of workers' compensation under state law, which provides wage, medical, and other benefits to employees injured in the course of employment. *See* [73] ¶ 12.

4

assigned to a single truck because of his seniority, as a courtesy. [73] ¶¶ 67–68.[6] Grillo also said McNamara or another Assistant Master Mechanic lied about processing a reimbursement request in January 2016, causing a six-month delay. [73] ¶ 77. Grillo filed a grievance about the delay and an internal complaint against McNamara for discrimination, harassment, and retaliation. [73] ¶ 77; *see* [80] ¶ 31. In a draft report, an HR investigator concluded that Grillo's claim was unsupported but that McNamara "should be reminded" to set an example as a supervisor and conduct employee matters in a timely and professional manner. [80] ¶ 31. A few weeks later, the conclusion was revised to state that while it appeared McNamara was withholding payment from Grillo, McNamara was following directions from HR. [80] ¶ 31. The investigator could not recall why the conclusion had been edited. [80] ¶ 31. Jim Douglas, an Assistant Master Mechanic, was Grillo's direct supervisor and reported to McNamara. [73] ¶ 3. Grillo said that Douglas and other supervisors made a few "snide remarks," like "don't get hurt," because of the number of injuries Grillo had. [73] ¶ 14. Even McNamara said that Grillo probably had more injuries than other employees. [80] ¶ 10. Douglas also mispronounced Grillo's last name for years, which other employees knew about. [80] ¶ 29; [56-6] at 10. The parties dispute whether Douglas intentionally mispronounced Grillo's name or called Grillo a "baby." [80] ¶ 29; [73] ¶ 14; [56-6] at 10.[7]

---

[6] Jim Douglas, an Assistant Master Mechanic, did not recall McNamara ever making Grillo drive a particular truck. [73] ¶ 68.

[7] Plaintiff's response to defendants' fact 14, [73] ¶ 14, contains nearly 20 additional facts—some new, some repetitive—which fail to properly controvert defendants' assertion and are therefore disregarded. Grillo's fact 30, [80] ¶ 30, is also disregarded. The fact quotes at least 5 different facts (about verbal harassment and hostile attitudes towards Grillo from

In February 2016, Grillo reported to Douglas that operating an overhead door was causing pain in his elbow and upper right arm. [73] ¶ 72. The next month, Grillo complained to Douglas about pain in his right arm and elbow from securing a load. [73] ¶ 23; [80] ¶¶ 6–7. According to Grillo, Douglas provided an accident report for this second incident but falsified the report by writing that Grillo had described two different versions of the event. [80] ¶ 7.[8] Grillo said that Douglas said McNamara told him to add a second version to the report. [80] ¶ 7.[9] Douglas said that he did not recall McNamara asking him to make an addition, but that McNamara could have. [80] ¶ 11; [56-6] at 17.[10] McNamara believed he asked Douglas to add more information to the report but could not recall the specific content. [56-5] at 27–29; [80] ¶ 11.[11]

---

approximately 2001 to 2005) from a 56.1 statement related to Grillo's 2006 lawsuit (which does not even include the defendant's responses).

[8] Defendants dispute Grillo's fact 7, [80] ¶ 7, arguing that the cited chronology entries attached to the complaint are inadmissible hearsay and that Grillo's testimony about the chronologies fails to support Grillo's factual assertion. During Grillo's deposition—which he does not cite in support of fact 7—Grillo testified about Douglas, McNamara, and the March 2016 accident report consistently with the cited "3/3/16" and "3/4/16" chronology entries attached to the complaint. [56-3] at 98; [27-1] at 5. Grillo testified that the chronology entries are based on personal knowledge. [56-3] at 9–10; *see* Fed. R. Civ. P. 602. Notwithstanding Grillo's incomplete citation, his additional fact 7 is deemed admitted. (This does not mean all of Grillo's chronology entries attached to his first amended complaint are admitted or admissible. Standing alone, the attached chronologies are inadmissible. And some contain inadmissible hearsay.)

[9] Grillo's testimony about Douglas's statement about McNamara's statement is admissible as an opposing-party statement. *See* Fed. R. Evid. 801(d)(2). McNamara's statement, within Douglas's statement, is also a statement of a party opponent and a non-hearsay direction, so there is no double-hearsay problem.

[10] Grillo misattributes Douglas's testimony. [80] ¶ 11. Douglas's testimony was about Grillo's March 2016 injury, not his subsequent injury in May 2016. [56-6] at 17.

[11] Grillo's 2019 workers' compensation settlement did not include this injury from March 2016. [72-25]; [73] ¶ 64; [80] ¶ 6.

In May 2016, Grillo injured his left knee and filed a workers' compensation claim. [73] ¶ 27. According to Grillo, as he was getting out of a truck using the handholds, he stepped on a chunk of salt, and his left knee "buckled with sharp pain and weakness." [73] ¶ 27. A few days later, a doctor selected by the District diagnosed Grillo with a left knee sprain. [73] ¶ 28; [80] ¶ 8. The doctor approved Grillo to drive vehicles with the following restrictions: no lifting, pushing, pulling, kneeling, squatting, or climbing, and alternate between standing and sitting. [73] ¶ 28; [80] ¶ 8. Grillo underwent an MRI and saw his own doctor for treatment the following month. [73] ¶ 29; [80] ¶ 9. His doctor recommended surgery. [73] ¶ 30; [80] ¶ 9. The District's independent medical evaluator reviewed the MRI, Grillo's doctor's notes, and concluded that Grillo's left knee injury was from a pre-existing health condition. [73] ¶ 30; [80] ¶ 9. The evaluator indicated any daily activity would put Grillo at risk, disagreed with the surgery recommendation, and stated that Grillo was capable of driving trucks with automatic transmissions. [73] ¶ 30; [80] ¶ 9. Based on the medical evaluator's assessment, the District's Claims Administrator—who advised supervisors on permissible work modifications and the appropriate coding for employees involved in workers' compensation claims—told McNamara that Grillo could return to work on full duty in August. [73] ¶ 31; [80] ¶¶ 9, 12, 19.

In early August, Grillo's doctor submitted a report that Grillo was able to drive a truck, but with significant restrictions, including no extended climbing, squatting, twisting, lunging, kneeling, pushing, pulling, or walking. [73] ¶ 32; [80] ¶¶ 9, 27.[12]

---

[12] Defendants do not cite to evidence that controverts Grillo's doctor's conclusion about Grillo's ability to drive a truck. [80] ¶ 27. Citing to Grillo's doctor's report, standing alone,

Grillo's doctor disagreed with the District's medical evaluator, stating that Grillo's symptoms were related to the incident in May 2016, regardless of a pre-existing condition, and asked the District to approve surgery. [73] ¶ 32; [80] ¶ 9. When Grillo returned to work the second week of August, the Claims Administrator told McNamara and Douglas to send Grillo home because the District did not accommodate modifications for non-work-related injuries (and the District's evaluator had concluded the injury was from a pre-existing health condition). [73] ¶ 33; [80] ¶ 14. McNamara followed the Claims Administrator's advice, and Douglas sent Grillo home. [80] ¶¶ 14–15, 19, 26.[13] But the Claims Administrator gave McNamara and Douglas the wrong code, so they miscoded Grillo's status as "duty work restriction" instead of "injury claimed, no pay," the proper code for injuries disputed as work-related. [73] ¶ 33; [80] ¶¶ 14, 19. About two and a half weeks later, Grillo had surgery on his left knee and could not drive a truck. [73] ¶ 34; [80] ¶ 25. The District eventually settled Grillo's workers' compensation claim (in 2019) but did not concede his left knee injury was work-related. [72-25]; [73] ¶ 64; [80] ¶ 6.

One day, while Grillo was out, McNamara told Douglas to code Grillo "absent without leave, no pay" (AWOL) if Grillo was not applying for ordinary disability. [73] ¶ 41; [80] ¶ 20.[14] McNamara explained this coding was required because Grillo's

---

fails to create a material dispute that Grillo was unable to drive a truck with work restrictions that prohibited repetitive movements.

[13] Grillo's description that upon repeated questioning, McNamara refused to answer whether he was required to follow the Claims Administrator's coding recommendations mischaracterizes McNamara's testimony and is disregarded. [80] ¶ 19.

[14] McNamara's testimony does not support Grillo's assertion that McNamara did not remember coding anyone other than Grillo AWOL, so that part is disregarded. [80] ¶ 20.

injury did not happen at work. [80] ¶ 20. Douglas called Grillo, who insisted the correct code was "injury claimed, no pay" and refused to apply for ordinary disability. [80] ¶ 21. Douglas directed someone to code Grillo AWOL, which meant a loss of pay, health and pension benefits, and the risk of disciplinary action. [80] ¶¶ 21, 23, 24. However, less than half an hour later, McNamara spoke with the Claims Administrator, who advised him to code Grillo as "injury claimed, no pay," and McNamara told Douglas to update the code. [80] ¶ 21; [72-24] at 5. The Claims Administrator had never advised coding an employee AWOL and recognized the initial code of "duty work restriction" was also wrong. [80] ¶ 21. Douglas had never used AWOL for anyone else, apologized to Grillo for the misunderstanding, and acknowledged Grillo was correct. [80] ¶ 21.

That October, the District implemented a policy that provided temporary work, including computer learning, for up to six months for employees unable to perform regular duties because of undisputed work-related injuries. [73] ¶¶ 12, 35. The work still needed to benefit the District. [73] ¶ 35. The temporary program did not extend to employees with disputed work-related injuries. [73] ¶ 36. A separate policy applied to employees with disabilities under the ADA. [73] ¶ 36.[15] Under state law, District employees who became disabled for non-work-related reasons were entitled to

---

[15] Grillo's sweeping denial of defendants' fact 36, [73] ¶ 36, fails, and the fact is deemed admitted. Grillo does not cite to specific evidence in the record that suggests the fact is misleading. His claim that the District's policy is "per se illegal" is argumentative and therefore disregarded. And the denial does not contradict the Director of HR's testimony because the Director never admitted the temporary program was for non-work-related impairments under the ADA. [56-22] at 5–6. The fourth bullet point of the temporary work program policy stated that a different policy applied to individuals with disabilities under ADA and/or non-work-related impairments. [56-21] at 2.

ordinary disability benefits. [73] ¶ 51. Grillo knew he could not qualify for ordinary disability benefits unless he dropped his workers' compensation claims that his injuries were work-related. [73] ¶ 51.

In November, the District's HR manager sent Grillo a letter stating that Grillo had been coded AWOL effective late September—around the same time the Claims Administrator had told McNamara, who told Douglas, to remove the AWOL code. [80] ¶¶ 21–22. Grillo submitted a letter to HR, complaining about being ordered to leave work in August, not qualifying for the District's temporary work program, and the coding dispute. [73] ¶ 38. The letter also stated that Grillo had been unable to return to work since his knee surgery. [73] ¶ 38; [56-24] at 2. The HR manager emailed the Claims Administrator, who confirmed that "injury claimed, no pay" was the proper code and that Grillo's department appeared to be "continuing to properly code him." [73] ¶ 39; [80] ¶ 22. A few days later, McNamara indicated his department would start coding Grillo "FMLA," because the District had approved Grillo's request for leave under the Family and Medical Leave Act. [73] ¶ 40; [56-17] at 10–11.

But the coding errors persisted. In early December, the Compensation and Benefits Manager told Grillo that his benefits had been discontinued effective October 2016 based on Grillo's AWOL coding from September. [73] ¶ 41; [80] ¶ 23. Grillo responded that "injury claimed, no pay" was the correct code, that his workers compensation claims were still in dispute, and that if the Illinois Workers' Compensation Commission determined his injuries were not work-related, he would

be covered by ordinary disability benefits. [73] ¶ 42. In mid-December, an HR representative told Grillo his benefits were reinstated through January. [73] ¶ 42.

In early January 2017, Grillo—who had not worked since August—visited his doctor about a right shoulder injury. [73] ¶ 48. A few weeks later, an HR representative advised Grillo to submit paperwork for ordinary disability and FMLA to avoid having his benefits discontinued in February. [73] ¶ 43. Grillo responded that his doctor had faxed the FLMA paperwork in mid-January and that he would not sign up for ordinary disability because it required him to concede his injuries were not work related. [73] ¶¶ 44–45. The HR representative noted that after exhausting FMLA leave, Grillo would have to decide between ordinary disability, an unpaid leave of absence, resignation, or retirement. [73] ¶ 44.

However, beginning in February, Grillo's absences were coded "ordinary disability applied for" because Grillo changed his mind and applied for ordinary disability. [73] ¶¶ 48, 58. He submitted one application for his right shoulder based on his January doctor's visit. [73] ¶ 48. In the paperwork, Grillo's doctor checked that there was reason to believe Grillo's right shoulder injury was work-related and indicated they were seeking approval for surgery through workers' compensation. [73] ¶ 48. The form stated employees were not eligible for ordinary disability if they indicated the cause was work-related. [73] ¶ 48. The doctor also noted that as of early January, Grillo's right shoulder injury prevented him from driving trucks, and that Grillo could only perform "light duty desk work" starting February 16 until surgery. [73] ¶ 48. Grillo also submitted an ordinary disability application for his left knee

injury and sought benefits from late August 2016 to mid-February 2017. The doctor marked the box that the injury was work-related, and indicated that due to his left knee injury, Grillo had been unable to work from June to September 2016 (during which he had knee surgery followed by physical therapy) but that Grillo had been able to return to work in October 2016 if limited to "light duty desk work, no kneeling, squatting or heavy lifting." [73] ¶ 49; [56-34] at 3. The doctor also noted that Grillo was awaiting treatment for an unrelated hip surgery. [73] ¶ 49; [56-34] at 3.

Under the FMLA, Grillo's leave of absence was extended through February, and he was required to submit a fitness-for-duty certification form to return to work. [73] ¶¶ 46–47. The form stated that Grillo was able to return to work on February 16, but was limited to "light duty desk work—computer training" and could not use his right arm except for writing, typing, or fine manipulation. [73] ¶ 47. The form indicated Grillo could return to full duty six months after surgery for his right shoulder. [73] ¶ 47. The District denied Grillo's request under the FMLA but recommended that Grillo follow the District's policy for requesting reasonable accommodations under the ADA for non-work-related injuries and provided further instructions. [73] ¶ 50. The HR manager testified that Grillo's request was disapproved because his injury was not work-related. [73] ¶ 50. A few days later, in late February, the Metropolitan Water Reclamation District Retirement Fund, the benefit plan for the District's employees, denied Grillo's ordinary disability applications for his right shoulder and left knee injuries. [73] ¶ 51. Grillo's coding then changed from "ordinary disability applied for" to AWOL. [80] ¶ 23. Alternatively,

Grillo could have potentially been coded "injury claimed, no pay." [73] ¶ 58; [80] ¶ 19. Grillo agreed that if the workers' compensation committee concluded his injuries were not work-related, AWOL would be the appropriate code. [73] ¶ 58.

In early March 2017, Grillo had surgery on his right shoulder and right knee. [73] ¶ 59.[16]

Grillo, under protest, followed HR's instructions and submitted a reasonable accommodation request under the ADA. [73] ¶ 52. He described his medical condition as recovering from a right shoulder surgery related to a work injury from 2012. [73] ¶ 52; [56-36] at 2. His restrictions were the same ones listed in his FMLA fitness-for-duty certification: no use of his right arm except for writing, typing, or fine manipulation; no lifting, carrying, pushing, pulling, or overhead work. [73] ¶ 52. He indicated that his medical condition restricted him from performing manual tasks central to daily life, lifting, and working and requested the same accommodation, "light desk duty, computer training." [73] ¶ 52. On the same day, Grillo filed an internal grievance about the denial of his fitness-for-duty certification under the FMLA and argued that he fit the criteria for the District's temporary six-month work program. [73] ¶ 54. He requested admission into the temporary work program to perform computer work, reimbursement for lost time, and also alleged

---

[16] Grillo alleges this surgery was for his left knee, [80] ¶ 25, but the supporting doctor's report described it as "post right knee arthroscopy and status post right shoulder rotator cuff repair." [72-19] at 2. Grillo cites no evidence suggesting his surgery in March 2017 was for his left knee that he injured in May 2016.

discrimination, harassment, and retaliation. [73] ¶ 54. The grievance was denied. [73] ¶ 54.

In mid-March, the District sent Grillo's doctor a letter requesting additional information by the first week of April in order to process Grillo's reasonable accommodation request under the ADA. [73] ¶ 55. At the end of April, Grillo was notified that his health insurance benefits had been discontinued, retroactive to March 2017, because his absences disqualified him as a full-time employee, and benefits were canceled "retroactive to the first day of the month in which the employee failed" the minimum required hours. [73] ¶¶ 56–57. Grillo could either return to work full time or purchase insurance through COBRA. [73] ¶ 56.

In May, Grillo's doctor responded (past the deadline) to the District's questions about Grillo's accommodation request under the ADA. [73] ¶ 59. Grillo's doctor described Grillo's medical condition as recovering from the March surgeries on his right knee and right shoulder. [73] ¶ 59. Echoing Grillo's submissions, the doctor indicated that Grillo could not use his right arm, except for writing and typing, that these restrictions were temporary, and that Grillo could return to full duty in approximately September. [73] ¶ 59. He also wrote that Grillo was unable to reach, push, pull, carry, lift, or perform any overhead activities with his right arm. [73] ¶ 59. In late May, three Master Mechanics, including McNamara, and a Managing Civil Engineer concluded that Grillo's proposed accommodation, based on his right arm

14

injury, did not allow him to perform the essential functions of a truck driver, and the District denied Grillo's request. [73] ¶ 60.[17]

In late August 2017, Grillo's doctor cleared him to work at full capacity, but Grillo had to wait nearly three weeks until the District's doctor approved his return to work, which resulted in the loss of pay and Grillo's ability to receive a full pension credit. [73] ¶¶ 9, 61.[18] When Grillo finally returned, his AWOL code was removed. [80] ¶ 23. Grillo was never formally disciplined for the AWOL code. [73] ¶ 65.[19]

In November, Grillo filled an internal grievance against the District for denying his requests under workers' compensation, ordinary disability, the ADA, and the temporary return to work program. [73] ¶ 63. He indicated that two younger employees had been accepted into the temporary program, allowed to work with significant restrictions, and coded to keep their pay and benefits. [73] ¶ 63. Truck driver Rob Miller suffered a knee injury (a comparison examined in Grillo's 2006

---

[17] Grillo's response to defendants' fact 35 contains the following additional facts that are disregarded for noncompliance with Local Rule 56.1: the District did not consider Grillo for non-truck-driver positions; the Claims Administrator said that the temporary return to work program offered computer courses to enhance an employee's skills; and Grillo's 2016 and 2017 annual reviews recommended Grillo participate in an e-learning program. [73] ¶ 35. Grillo's denial of defendants' fact 16, about his accommodation requests, is also disregarded: saying plaintiff's interrogatory answer speaks for itself does not properly controvert defendants' assertion characterizing Grillo's requests for accommodation. Defendants' assertion is an accurate summary of the cited materials. Defendants' fact 16 is deemed admitted.

[18] Grillo's denial of defendants' characterizations of the alleged adverse actions, [73] ¶ 9, fails, and fact 9 is deemed admitted. Stating the content of the cited interrogatories "speak for themselves" does not establish a disagreement. Grillo's additional fact in his response to defendants' fact 61, [73] ¶ 61, that the District messed up submitting Grillo's paperwork, causing the long delay, is also disregarded for noncompliance with Local Rule 56.1. Grillo's related header, [80] at 19, is similarly disregarded because it fails to cite supporting evidence and is not a properly numbered paragraph.

[19] Grillo's response to defendants' fact 17, [73] ¶ 17, contains additional facts that are disregarded for noncompliance with Local Rule 56.1.

15

lawsuit), and truck driver Gina Nutting had cancer. [73] ¶ 11; [56-3] at 15–18.[20] Grillo also said Jack Vollriede, an electrician, experienced a similar injury and was allowed to participate in the temporary work program. [73] ¶¶ 11, 13; [56-3] at 28. The District determined Miller's and Vollriede's injuries were work-related. [73] ¶ 12.[21] Grillo testified that in addition to Miller (b. 1971), Nutting (b. 1964), and Vollriede (b. 1964), Larry DuChamps (b. 1958) was also younger than Grillo and allowed to return to work with significant restrictions and/or participate in the temporary work program. [73] ¶¶ 12, 13; [56-3] at 15–18.[22] The grievance also stated that Grillo had

---

[20] Defendants' fact 11, [73] ¶ 11, is deemed admitted. Grillo's denial that "[t]he District is attempting to avoid the contents of Grillo's thorough Interrogatory responses, which remain in full force and effect," does not explain why defendants' assertion is not supported by Grillo's interrogatory answers. And to force the court to compare plaintiff's extensive interrogatory responses with defendants' fact 11 subverts the purpose of Local Rule 56.1, which is meant to streamline, not delay, the resolution of summary judgment motions. *See Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019).

[21] Grillo's responses to defendants' facts 12, 35, and 52 do not controvert the Claims Administrator's deposition testimony about the District's determination concerning Miller's and Vollriede's injuries. [73] ¶ 12. Defendants' fact 12 is deemed admitted.

[22] Grillo's additional fact 16, [80] ¶ 16, that the District previously permitted many employees to work light duty for non-work-related injuries is disregarded. Grillo's cited deposition testimony only describes one example in 2014 when Grillo was put on light duty of limited lifting, pushing, and pulling. [56-3] at 12. The citation fails to permit a reasonable inference about other employees, let alone many of them. (This fact may also be less helpful to Grillo because it is old and does not distinguish between light duty that permits some physical activity, as suggested by his testimony, [56-3] at 12, and instances of light duty where only computer work was possible.) Nor does the cited deposition support the admissibility of the 8/9/16 chronology entry attached to Grillo's complaint. The 8/9/16 entry cites the 6/15/16 entry for the proposition that many employees, including Grillo, had returned to work under light duty restrictions. [27-1] at 6. This entry from 2016 pertains to a different time period than Grillo's deposition testimony about 2014 and does not suggest that Grillo was permitted to work with light duty restrictions: "I had to miss another day due to the pain in my left knee, and because the District was not following the light duty restrictions." [27-1] at 6. The cited chronology entry does not even reference other employees and is inadmissible for lack of relevance and foundation, since Grillo did not cite evidence that this entry is based on personal knowledge. Finally, while Grillo's interrogatory answers mention that the District offered light duty and/or other accommodations to 6 other employees, the relevant interrogatory answers reference external documents (without describing the relevant

lost medical and dental benefits and vacation time. [73] ¶ 63. He alleged discrimination, harassment, retaliation, and a hostile work environment because of the charges he had filed with the EEOC (related to his 2001 and 2006 lawsuits) and the Illinois Labor Relations Board. [73] ¶ 63. The District and union decided to resolve this grievance (and another related one) after the workers' compensation committee ruled on Grillo's pending claims. [73] ¶ 64. An HR investigation into the alleged harassment concluded that Grillo's injuries were not work related, so his pay code had been adjusted appropriately. [80] ¶ 13.

On November 22, Grillo filed his third EEOC charge against the District, alleging age and disability discrimination, harassment, a hostile work environment, failure to accommodate, and retaliation. [73] ¶ 4. He described injuries to both knees and shoulders, his right hip, and lower back, and included 18 examples of misconduct from 2015 to the filing date. [73] ¶ 4.

In December 2017, Grillo took drug tests. [73] ¶ 80. In general, truck drivers were, under federal regulations and the collective bargaining agreement, subject to periodic random drug and alcohol testing. [73] ¶ 78. An HR analyst was responsible for administering the District's drug and alcohol testing program. [73] ¶ 78. According to Grillo, he was subject to "overly frequent" drug testing, [73] ¶ 79, in

---

content) and do not contain admissible evidence. *See* [73] ¶ 19; [56-8] at 9–21, 33–34. Wild-goose chases, like this one, waste the court's resources and time.

retaliation for his rights, and in one instance, McNamara, not HR, ordered a retest. [56-3] at 27.[23]

In February 2018, Grillo claimed he was denied overtime three times, and that two of these opportunities were given to drivers with less seniority. [73] ¶ 73. Grillo received overtime in 2018. [73] ¶ 74. Grillo also filed three pay grievances over the years: in 2013 for $34.50, in 2016 for overtime snow plowing, and in 2017 for working through break and lunch. [73] ¶¶ 75–76. The District and Grillo resolved these disputes. [73] ¶ 76.

HR investigated Grillo's discrimination claim and recommended that "McNamara and Douglas be counseled to be more mindful in their communication with Grillo." [80] ¶ 32. McNamara and Douglas did not recall if they were ever counseled about their conduct. [80] ¶ 33. An HR investigator did not know either. [80] ¶ 33. The Director of HR guessed that the District had only found a couple of supervisors and managers liable for discrimination, harassment or retaliation in the past. [80] ¶ 35. The HR Manager estimated the District found supervisors or managers liable for discrimination, harassment, or retaliation in around 10 cases out of 100 investigations. [80] ¶ 35. Two HR associates involved in 20 to 30 investigations did not recall finding in favor of an employee. [80] ¶ 35.

In April 2018, Grillo retired. [73] ¶ 2; [80] ¶ 1. From 2013 until his retirement, Grillo received "Meets Standards" on his performance evaluations. [73] ¶ 2; [80] ¶ 1.

---

[23] Grillo's response to defendants' fact 14, [73] ¶ 14, contains additional facts about drug testing. Grillo cannot subvert Local Rule 56.1 by including additional facts in his responses but not in a separate statement. These additional facts are disregarded.

When Grillo retired, HR closed his internal grievances. [73] ¶ 64. A few months later, Grillo filed this lawsuit. [73] ¶ 5; [1]. He alleged discrimination, harassment, failure to accommodate, and retaliation under the ADA, age discrimination, and constitutional violations of the Equal Protection Clause and First Amendment. [27]. At the motion to dismiss stage, I dismissed Grillo's *Monell* claim against the District, but allowed his other claims to proceed. [38]. A few months later, the District settled Grillo's five pending workers' compensation claims (as noted above) for $174,000. [72-25]; [73] ¶ 64; [80] ¶ 6.[24]

## III. Analysis

Grillo argues the District violated his statutory rights under the ADA and ADEA, and that McNamara and Douglas violated his constitutional rights under the Equal Protection Clause. But Grillo's strategy of hyperbole and mischaracterizing the facts cannot overcome his lack of evidence and legal argument.

### A. The ADA

The ADA prohibits disability discrimination in employment. 42 U.S.C. § 12112(a). "Disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). "Disability" should be construed in favor of broad coverage, and the term "substantially limits" should not demand extensive analysis. 42 U.S.C. § 12102(4)(A),

---

[24] Because Grillo concedes that he cannot prevail on his First Amendment claim against McNamara and Douglas, *see* [70] at 4, I omit any discussion of the facts of Grillo's complaints about health and safety, [73] ¶¶ 22, 69, 70–72.

(B); 29 C.F.R. § 1630.2(j)(1)(i).[25] Grillo meets the ADA's standard for "disability" because his most recent right shoulder injury substantially limited major life activities, including his ability to lift and work. [73] ¶ 59; *see* 42 U.S.C. § 12102(2)(A). At one point, he could not drive and therefore could not work as a truck driver in any capacity. [73] ¶¶ 47–48, 52; *see* 29 C.F.R. § 1630, App. (substantial limitations to working include substantial limitations to an individual's ability to perform a class of jobs or broad range of jobs in various classes compared to peers). Grillo presents sufficient evidence of an actual impairment. *See* 42 U.S.C. § 12102(1)(A). He also meets the ADA's low threshold to show a record of impairment, *see* 42 U.S.C. § 12102(1)(B), since he had a long history of injuries to his shoulders, knees and back, which permit a reasonable inference of substantial limitations in the past. [73] ¶¶ 23–25, 28, 30, 32, 64; *see* 29 C.F.R. § 1630.2(k); 29 C.F.R. § 1630, App. § 1630.2(k).[26]

Grillo cannot, however, prove he was regarded as disabled. *See* 42 U.S.C. § 12102(1)(C); 29 C.F.R. § 1630.2(l). While McNamara thought Grillo probably had more injuries than other employees, [80] ¶ 10, there is no evidence that McNamara, or anyone else at the District, objectively believed Grillo suffered major impairments

---

[25] EEOC regulations interpreting the ADA are entitled to deference. *Richardson v. Chicago Transit Authority*, 926 F.3d 881, 887 (7th Cir. 2019).

[26] Grillo's argument that his 2006 lawsuit establishes a record of impairment, [70] at 9, is wrong. Res judicata protects a final judgment on the merits of a claim from being relitigated. *McDonald v. Adamson*, 840 F.3d 343, 346 (7th Cir. 2016). The denial of the District's motion for summary judgment in 2006, where Grillo only asserted a record of impairment, was not a final judgment—the minute entry even stated there were genuine disputes of material fact. Minute Entry, [84], *Grillo v. Metropolitan Water Reclamation District of Greater Chicago*, No. 06-CV-01511 (N.D. Ill. 2007). The 2006 ruling does not preclude Grillo's claim from being relitigated.

that would last longer than six months. *See* 29 C.F.R. § 1630.15(f); 29 C.F.R. § 1630.2(g)(1)(iii); 29 C.F.R. § 1630, App § 1630.2(l) (the "regarded" prong examines whether the employer perceived an impairment that was not "transitory and minor"). The District's denial of his accommodation request does not mean they perceived his injury as severe—just that they believed Grillo could not perform the essential functions of his job with the requested accommodation. [73] ¶ 60. Similarly, the District's decision to settle his workers' compensation claims, after his retirement, provides no indication as to whether the District viewed his injuries as serious and substantial or temporary and minor. [73] ¶ 64.

Under the ADA, a plaintiff may use any combination of direct or circumstantial evidence to prove his claim. *See Rowlands v. United Parcel Service – Fort Wayne*, 901 F.3d 792, 801–02 (7th Cir. 2018). The question, under any theory of discrimination, is whether the evidence would permit a reasonable factfinder to conclude that Grillo would not have suffered the adverse action but for his actual, or record of, disability. *See id.* (citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016)).

### 1. Failure to Accommodate

To prevail on a failure-to-accommodate claim, a plaintiff must show 1) he was a qualified individual with a disability; 2) his employer was aware of his disability; and 3) the employer failed to reasonably accommodate his disability. *Youngman v. Peoria County*, 947 F.3d 1037, 1042 (7th Cir. 2020); 42 U.S.C. § 12112(b)(5)(A). Only Grillo's 2017 request for accommodations for his right shoulder falls within the statute of limitations. [73] ¶ 60; *see* 42 U.S.C. § 12117(a); § 2000e–5(e)(1); *Stepney v.*

21

*Naperville School Dist. 20*3, 392 F.3d 236, 239 (7th Cir. 2004) (an EEOC charge must be filed within 300 days after the alleged unlawful employment practice occurred). For Grillo, that window started on January 26, 2017, 300 days before the date of his EEOC filing. [73] ¶ 4.[27]

At bottom, Grillo's claim is that he should have been considered for the temporary work program, which included computer learning. [73] ¶¶ 12, 35. Reasonable accommodations include modifications or adjustments that enable a qualified individual with a disability to perform the essential functions of that position. 29 C.F.R. § 1630.2(o)(1)(ii). The District concluded that Grillo's inability to use his right arm prevented him from performing the essential functions of a truck driver (like driving) and denied his accommodation request. [73] ¶¶ 53, 60. The District was not required to create a light duty position as a reasonable accommodation. *See* EEOC Enforcement Guidance: Workers' Compensation and the ADA, 1996 WL 33161342, at *12 (September 1996).[28] However, the District was

---

[27] The rejection of Grillo's fitness-for-duty form under the FMLA, [73] ¶ 50, does not count as a separate failure to accommodate claim. Grillo first requested leave under the FMLA, [73] ¶ 40, which entitles employees to 12 weeks of leave for family or medical reasons. 29 U.S.C. § 2612(a). Under the FMLA, an employer may require employees seeking reinstatement to submit a fitness-for-duty certification form to confirm they are able to work. 29 C.F.R. § 825.312. The FMLA does not entitle employees to reasonable accommodations. Furthermore, Grillo's attempt to divide his right shoulder accommodation request into pre- and post-surgery requests also fails. Grillo never engaged in the interactive process twice. While in the process of seeking accommodations for pre-surgery, which would have been from February 16, 2017 until surgery, [73] ¶ 48, he underwent surgery in early March 2017. [73] ¶ 59. Consequently, his pre-surgery accommodation request bled into his post-surgery request (and both accommodation requests were effectively the same—temporary desk duty because of a right shoulder injury).

[28] EEOC interpretive guidance reflects "a body of experience and informed judgment to which courts and litigants may properly resort for guidance" and is entitled to a measure of respect, which is less deferential than the standard for implementing regulations. *Richardson v.*

required to provide another reasonable accommodation, absent undue hardship, which might have resembled a light duty position. *See id.*[29] This is because reasonable accommodations also include modifications or adjustments that allow a disabled employee "to enjoy equal benefits and privileges of employment as are enjoyed by other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(iii). "[A]n employer must apply its policy of creating a light duty position for an employee when s/he is occupationally injured on a non-discriminatory basis. In other words, an employer may not use disability as a reason to refuse to create a light duty position when an employee is occupationally injured." EEOC Enforcement Guidance, 1996 WL 33161342, at *12; *see also Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 680 (7th Cir. 1998) (the ADA requires employers to assign disabled employees to light-duty vacancies for temporary accommodations, if they are able to perform the job).

---

*Chicago Transit Authority*, 926 F.3d 881, 889 (7th Cir. 2019) (internal citations and quotations omitted). In the EEOC's guidance about light duty positions, the example to question 27 states, "R creates light duty positions for employees when they are occupationally injured if they are unable to perform one or more of their regular job duties. CP can no longer perform functions of her position because of a disability caused by an off-the-job accident. She requests that R create a light duty position for her as a reasonable accommodation. R denies CP's request because she has not been injured on the job. *R has not violated the ADA. However, R must provide another reasonable accommodation, absent undue hardship.* If it is determined that the only effective accommodation is to restructure CP's position by redistributing the marginal functions, and the restructured position resembles a light duty position, R must provide the reasonable accommodation unless it can prove that it imposes an undue hardship." EEOC Enforcement Guidance, Workers' Compensation and the ADA, 1996 WL 33161338, at *12 (September 1996) (emphasis added).

[29] Grillo never requested a permanent new position that would have required the District to bump another employee or create a vacancy (which the District was not required to do). *See Stern v. St. Anthony's Health Center*, 788 F.3d 276, 291 (7th Cir. 2015). Therefore, Grillo's failure to identity vacant non-truck driver positions, *see Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 856 (7th Cir. 2015), and the parties related arguments, are immaterial.

Here, the District's temporary work program did not appear to have a set number of positions, but rather created positions as necessary.

Nevertheless, Grillo fails to put forward enough evidence (admissible or otherwise) about the District's treatment of employees restricted to only computer work to reasonably infer that he was denied the same benefits as his occupationally-injured peers.[30] There is no evidence suggesting Miller and Nutting only performed computer work in the temporary work program. [73] ¶ 11. Employees in the temporary program still had to perform duties that were beneficial to the District, [73] ¶ 35, and Grillo fails to show that his restrictions still allowed him to perform beneficial work. *See Lacy v. Cook County, Illinois*, 897 F.3d 847, 865 (7th Cir. 2018) ("whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties.") (internal quotations and citations omitted).[31] Grillo's suggestion that McNamara wanted him gone because Grillo's injuries made McNamara look bad is unsupported by the evidence and does not suggest that McNamara's participation, [73] ¶ 60, corrupted the interactive process. *See* 29 C.F.R. § 1630.2(o)(3) (the employer may need to initiate an informal, interactive process with the disabled individual to determine the accommodation); *Scheidler v. Indiana*, 914 F.3d 535, 542 (7th Cir. 2019) (the plaintiff produced no evidence that the interactive process broke down). Similarly, Grillo's 2001 lawsuit,

---

[30] *See e.g.* footnotes 17 and 22 for why some of Grillo's evidence is inadmissible.

[31] The District did not argue that a position resembling one in the temporary work program would have caused undue hardship. *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002) (it's the employer's burden to show undue hardship in the particular circumstances).

when the EEOC found there was reasonable cause to believe the District violated the ADA, [80] ¶ 4, is too temporally distant and disconnected from the other evidence to reasonably suggest the District violated the ADA in this lawsuit. *Cf. Castro v. DeVry University, Inc.*, 786 F.3d 559, 567–68 (7th Cir. 2015) (in retaliation claims, long delays in the absence of other evidence weaken the inference of causation). Grillo cannot show the District failed to reasonably accommodate his disability.

Any other accommodation requests Grillo made are time barred. Discrete acts of misconduct are identifiable and put employees on notice about filing a discrimination charge. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) Therefore, discrete acts outside the statute of limitations are not actionable. *Id.*[32] The continuing violation doctrine creates an exception for harassment or hostile work environment claims, where the alleged unlawful action involves repeated conduct and makes the unlawful conduct difficult to pinpoint, in contrast to a discrete act. *Id.* at 15. "A refusal to accommodate is a discrete act—not an ongoing omission—and therefore the continuing violation doctrine does not apply." *Teague v. Northwestern Memorial Hosp.*, 492 Fed.Appx. 680, 684 (7th Cir. 2012).[33] Grillo's attempt to paint a pattern of repeated denials is therefore misplaced—and contradicted by the facts. In August 2016, Grillo requested different accommodations for a different injury: all the doctors indicated he was able to drive in some capacity but required some pre-surgery

---

[32] Discrete acts may, however, be used as relevant background evidence in support of a timely claim. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

[33] Federal Rule of Appellate Procedure 32.1 permits citation to unpublished cases. Although not precedential, *Teague* is correct—a refusal to accommodate is single, discernible act of misconduct.

restrictions due to his left knee injury. [73] ¶¶ 28, 30, 32. But Grillo never engaged in the ADA's interactive accommodation process for his left knee. He never requested to return to work in October 2016—rather a document submitted months later stated that Grillo was able to return to work in October. [73] ¶ 49. Grillo's own letter, from November 2016, indicated that he had been unable to work in October. [73] ¶ 38. And while Grillo was recovering from his left knee surgery in August 2016, he pursued treatment for his right shoulder starting in January 2017, which changed his accommodation needs. [73] ¶¶ 34, 48. Grillo's attempt to connect his left knee accommodation request in 2016 with his requests in 2017 for his right shoulder fails to create a second cause of action under a failure-to-accommodate theory.[34] Grillo jumbles the facts to suggest that he requested accommodations in October 2016 and that his surgery in 2017 was for his left knee, *see* footnote 16, but the underlying evidence does not support the suggestion.[35]

### 2. *Disability Discrimination*

Grillo also argues that the District discriminated against him, a theory that encompasses more adverse actions than a failure to accommodate claim and requires proof that 1) Grillo was disabled; 2) he was qualified to perform the essential

---

[34] The dispute about whether Grillo's left knee injury was work-related under workers' compensation laws does not change an employer's obligations under the ADA and is therefore immaterial. Furthermore, even if I were to infer that Grillo's injury was work-related, it is an undisputed fact that the District disagreed.

[35] Grillo's argument that the District had a 100% healed policy for employees with non-occupational injuries is wrong. Neither the HR Director nor the policy itself ever indicated that the temporary program was for non-work-related impairments under the ADA. [56-22] at 5–6; [56-21] at 2; *see* footnote 15.

functions of his job with or without reasonable accommodation; and 3) that his disability was the "but for" cause of the adverse employment action. *See Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020). Adverse employment actions materially alter the terms and conditions of employment, such as a termination or reduction in compensation or benefits. *See Kurtzhals v. County of Dunn*, 969 F.3d 725, 729 (7th Cir. 2020) (internal citations omitted). Adverse actions do not include mere inconveniences, changes in responsibilities, or every action that makes an employee unhappy. *See id.* One way to establish an employer's discriminatory motive is to show that the employer lied about their stated reasons for taking the adverse action. *McCann v. Badger Mining Corporation*, 965 F.3d 578, 589 (7th Cir. 2020). It does not matter whether the employer's reasoning was inaccurate or unfair, but rather whether the employer honestly believed the reason it offered to explain the adverse act. *See id.* (internal citations and quotations omitted).

Grillo's disability discrimination claims fail on the issue of causation. In 2017, Grillo lost his health benefits. [73] ¶¶ 56–57; [80] ¶ 23. The District coded Grillo AWOL because by March 2017 Grillo had exhausted leave under the FMLA, and his absences disqualified him as a full-time employee. [73] ¶¶ 56–57. Grillo has not presented any facts or argument to rebut the District's honest belief that Grillo, who had not worked for over six months, did not qualify as a full-time employee. Grillo does not suggest that the other potential code, "injury claimed, no pay," [73] ¶ 58, applied to employees on extended leaves of absence (or to his 2017 injuries for that matter). And evidence of another code, standing alone, does not suggest that the

District lied about why Grillo was coded AWOL. Grillo's comparison to Miller and Nutting, the other truck drivers, also fails—any coding difference was because their injuries were considered work-related, and does not suggest that Grillo's code was based on his disability. [73] ¶¶ 12, 63; *see Monroe v. Indiana Department of Transportation*, 871 F.3d 495, 507 (7th Cir. 2017) (for similarly situated comparisons to work, the plaintiff must show that the individuals are "directly comparable in all material respects," meaning there are enough common factors to allow for a meaningful comparison to determine whether intentional discrimination explains any differences) (internal citations and quotations omitted). Grillo also lost a pension credit because the District's doctor took multiple weeks to clear his return to work. [73] ¶¶ 9, 61. But Grillo provides no evidence that the delay was motivated by discriminatory animus. *See* footnote 18. A reasonable factfinder could not conclude that Grillo lost his insurance benefits and a pension credit because of his disability.

As for Grillo's remaining claims under his disability discrimination theory: the denial of Grillo's grievance about his fitness-for-duty certification was not a material adverse action because it did not significantly change the terms and conditions of his employment. [73] ¶ 54. While Grillo's ordinary disability applications were also denied within the actionable time period, it is undisputed that the Retirement Fund denied them—not the District. [73] ¶ 51. Grillo cannot assert a claim against the wrong defendant. And while both parties hotly contested whether Grillo's injuries were work-related, any work-related dispute falls within the exclusive jurisdiction of the Illinois Workers' Compensation Act and does not evince discrimination on the

28

basis of disability. *Hunt-Golliday v. Metropolitan Water Reclamation District of Greater Chicago*, 104 F.3d 1004, 1016 (7th Cir. 1997). Finally, as discussed in the previous section, discrete adverse actions outside the statute of limitations are time-barred, such as the District's numerous coding errors in 2016 (which did not alter the conditions of his employment because his benefits were reinstated). [73] ¶¶ 41–42; [80] ¶¶ 21–22. Ultimately, Grillo is left with empty rhetoric that the District's actions were directly tied to Grillo's health, with no evidence to back up the claim.

### 3. Retaliation

Retaliation requires proof that Grillo suffered an adverse action solely because he engaged in statutorily protected activity. *See Kotaska v. Federal Express Corporation*, 966 F.3d 624, 632 (7th Cir. 2020). Under the ADA, protected activity is when an employee opposes their employer's non-compliance with the statute, 42 U.S.C. § 12203(a), and adverse retaliatory actions are ones that would dissuade a reasonable employee from engaging in protected activity. *Koty v. DuPage County, Illinois*, 900 F.3d 515, 520 (7th Cir. 2018). Grillo's retaliation argument rests on the same adverse actions asserted in his other ADA claims, his previous federal lawsuits, and various internal complaints. [70] at 28. But retaliation is a different theory of liability and his two-sentence argument fails to "inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Rozumalski v. W.F. Baird & Associates, Ltd.*, 937 F.3d 919, 925 (7th Cir. 2019) (internal citation and quotations omitted); *see also Betco Corporation, Ltd. v. Peacock*, 876 F.3d 306, 309 (7th Cir. 2017). It is not the court's responsibility to research and construct Grillo's

29

arguments. *See Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010). The only specific example of retaliation Grillo mentions is time barred.[36] And Grillo makes no reasonable connection between his 2001 and 2006 lawsuits and an actionable retaliatory act. *See Castro*, 786 F.3d at 567–68 (long delays weaken causation). Grillo's conclusory analysis, which fails to identify specific evidence in support of each element of his retaliation claim, is construed as waiver. *See Gross*, 619 F.3d at 704.

### 4. *Harassment*

To prove harassment, Grillo must present evidence that 1) he was subject to unwelcome harassment; 2) the harassment was based on his disability; 3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and 4) there is a basis for employer liability. *See Ford v. Marion County Sheriff's Office*, 942 F.3d 839, 856 (7th Cir. 2019). Because the continuing violation theory applies to harassment claims, acts outside the limitations period that are part of an on-going pattern that relate to an act within the limitations period are actionable. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117. Whether a hostile environment exists depends on the totality of the circumstances,

---

[36] In January 2016, Grillo filed a grievance against McNamara, in part because of the six-month reimbursement delay. [73] ¶ 77. While Grillo alleged discrimination in his grievance, he provides no evidence that it was on the basis of disability and therefore protected activity under the ADA. [80] ¶ 31. Grillo also argues that McNamara retaliated against him the following month by falsifying an accident report, interfering with Grillo's ability to obtain workers' compensation benefits for the injury. [80] ¶ 7; [70] at 11. But Grillo presents no evidence that he filed a workers' compensation claim for his March 2016 injury for McNamara to interfere with. *See* footnote 11. Grillo also presents no evidence that McNamara retaliated against him in connection with his May 2016 left knee injury. [70] at 28. Even though McNamara wrote that Grillo's injury did not happen at work, [80] ¶ 20, McNamara was following the Claims Administrator's previous instructions. [73] ¶ 33. Grillo's distracting and misleading examples fail to establish issues for trial.

including the frequency of the conduct, the severity, whether the conduct was threatening, humiliating, or merely an offensive utterance, and whether the conduct unreasonably interfered with an employee's work performance. *Id.* at 116.

Viewing the evidence as a whole, Grillo fails to show an abusive, discriminatory work environment. He identifies a number of workplace annoyances, like when McNamara assigned him to drive different trucks, and, according to Grillo, made him retake a drug trust; the six-month reimbursement delay; Douglas's snide remarks about not getting reinjured and mispronouncing Grillo's name; and a few instances of overtime and pay grievances (which were resolved). *See* [73] ¶¶ 3, 14, 67, 73–74, 76–77; [80] ¶ 29; [66-3] at 27. But federal law does not protect Grillo against petty slights, minor annoyances, and bad manners. *See Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016) (discussing retaliation under Title VII). For a number of other acts, Grillo fails to show pretext, like a secret motive to hurt Grillo based on his right shoulder injury or history of impairments. While there were a number of coding errors in 2016, McNamara and Douglas were just following the Claims Administrator's directions (which were based on Grillo's workers' compensation dispute) and quickly rectified the coding mistake. [80] ¶¶ 14–15, 19, 21, 26; [73] ¶ 39. As discussed earlier, Grillo fails to show that the District lied about its reasons for coding Grillo AWOL (because he was no longer a full-time employee) or that McNamara lied about believing Grillo was unable to perform his essential job duties. [73] ¶ 60. And there is no evidence McNamara and Douglas played any role in the three-week delay that caused Grillo to lose a pension credit. [73] ¶¶ 9, 61. While Grillo filed grievances

31

against McNamara, and HR documented communication problems between Grillo and McNamara and Douglas, [73] ¶¶ 38, 77; [80] ¶¶ 31–32, at most, this evidence demonstrates a strained relationship. Difficulties with managers is normal workplace friction. *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004).[37] A pattern of misconduct fails to crystalize from the evidence. Grillo was never frequently threatened, harassed, intimated, or taunted on the basis of his disability.[38]

## B. The ADEA

The ADEA protects workers aged 40 and older from age-based employment discrimination. 29 U.S.C. §§ 621(b), 631(a); *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367 (7th Cir. 2019). The same statute of limitations and but-for causation standards discussed above apply to the ADEA but in the context of age. *See id.*; 29 U.S.C. § 626(d)(1)(B); *Riley v. Elkhart Community Schools*, 829 F.3d 886, 890 (7th Cir. 2016). Like his retaliation claim, Grillo's argument about age discrimination is too conclusory and underdeveloped, [70] at 29, and is construed as waiver. *See Rozumalski*, 937 F.3d at 925; *Betco Corporation, Ltd.*, 876 F.3d at 309. Grillo even writes, "there clearly is less evidence that Grillo's age was a factor in the District's

---

[37] Grillo's statistical evidence about the District's EEO investigations, [80] ¶ 35, does not permit a reasonable inference that the District conducted "sham" investigations.

[38] Even when considering the inadmissible evidence, see footnotes 7, 19 and 24, which mostly amount to other examples of workplace annoyances, Grillo fails to show an abusive environment. Additionally, the disregarded facts about hostile conduct from 2001 to 2005, [80] ¶ 30, do not involve McNamara or Douglas, who Grillo argues were the primary aggressors of hostile and adverse conduct, [70] at 26, and are too temporally distant and unrelated to the other evidence to establish a hostile work environment over a decade later. *See Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 338 (7th Cir. 2012) (close temporal proximity provides evidence of causation).

decisions." [70] at 29. The one example Grillo provides to save his claim is that the District sent him home in August 2016, [80] ¶ 14, ten days short of his 61st birthday. [70] at 29. Not only is this alleged adverse action time barred, but Grillo also provides no evidence of anti-age animus. The District sent Grillo home because they did not consider his left knee injury work-related, [80] ¶ 14, a motivation that Grillo fails to rebut with other evidence about age. While Miller and Nutting may have been younger than Grillo, Grillo does not present any evidence of how old they were when they returned to work or that they were directly comparable in all material respects. *See McDaniel*, 940 F.3d at 367 (the same standard for similarly situated employees applies to the ADEA). As discussed earlier, Miller's and Nutting's injuries were considered work-related, [73] ¶ 12, so it would be difficult to discern if any differential treatment was based on age or their workers' compensation claims. Grillo's ADEA claim does not survive summary judgment.

## C.   Equal Protection Clause

Grillo bases his equal protection argument on the motion to dismiss order. [70] at 29. But Grillo does not explain why summary judgment should not be entered on his equal protection claim. Nor does Grillo rebut any of defendants' arguments. Consequently, Grillo's equal protection argument, or more specifically, the lack thereof, is construed as waiver. *See Rozumalski*, 937 F.3d at 925; *Betco Corporation, Ltd.*, 876 F.3d at 309; *Gross*, 619 F.3d at 704.

Furthermore, the evidence Grillo puts forward, as discussed above, demonstrates that he could not prove an equal protection claim, which requires

33

showing that McNamara's and Douglas's actions had a discriminatory effect and that McNamara and Douglas were motivated by a discriminatory purpose. *See Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017) (describing the elements of an equal protection claim).[39] Grillo also could not show that McNamara and Douglas lacked a rational basis for their conduct because the evidence is that they had conceivable reasons for acting the way they did (like when the followed the Claims Administrator's instructions for coding). *See United States v. Harris*, 197 F.3d 870, 876 (7th Cir. 1999) (disabled individuals are not a suspect class and therefore subject to rational basis review); *Srail v. Vill. of Lisle*, 588 F.3d 940, 946 (7th Cir. 2009) (describing the standard for rational basis review as whether there is any conceivable basis for the state action). Finally, Grillo's equal protection claim cannot satisfy § 1983's requirements for personal liability because Grillo cannot show McNamara and Douglas were personally involved in the alleged constitutional deprivation. *See Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019) (plaintiffs must show defendants directed or consented to the misconduct). For example, the Claims Administrator determined modified duty for workers' compensation claims and the corresponding coding, while the Director of Maintenance and Operations approved accommodation requests under the ADA—not McNamara. [80] ¶¶ 14–15, 19, 26; [73] ¶ 60. Like all his other claims, Grillo's equal protection claim fails to survive summary judgment.

---

[39] A two-year statute of limitations applies to § 1983 claims. *Lewis v. City of Chicago*, 914 F.3d 472, 478 (7th Cir. 2019).

## IV.     Conclusion

The defendants' motion for summary judgment, [55], on all counts is granted.

Enter judgment and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date:  September 22, 2020